EPPS v 4 QUARTERS RESTORATION LLC

Docket No. 147727. Argued on application for leave to appeal March 10, 2015. Decided September 28, 2015.

Following a flood in 2006 that did extensive damage to their home, Danny and Joyce Epps brought an action in the Wayne Circuit Court against the individuals and businesses involved in the restoration of their home or with the flow of monies associated with the restoration project. Their insurance provider, defendant Auto-Owners Insurance Company, employed defendant AM Adjusting to refer plaintiffs to professionals capable of performing the restoration work. AM Adjusting referred plaintiffs to defendant Troy Willis and his companies, defendants 4 Quarters Restoration LLC and Emergency Insurance Services. Plaintiffs contracted with Willis to perform the restoration work. Willis failed to inform plaintiffs that his residential builder's license had been revoked. Willis began work on plaintiffs' home and making insurance claims through their homeowners' policy. When Willis received checks from Auto-Owners, he indorsed them himself, signing plaintiffs' names. Willis would then cash the checks at defendant Denaglen Corp.'s check-cashing business, MBM Check Cashing. Denaglen would then deposit the funds into its account at defendant Comerica Bank. Ultimately, Willis received and indorsed checks from Auto-Owners totaling $128,047. Willis discontinued work on plaintiffs' home at the end of 2006. The parties disputed whether the restoration was complete and whether the work that had been done was performed in a satisfactory manner. After plaintiffs filed suit, Comerica filed an interpleader action and deposited $128,047 from Denaglen's account into escrow. The claims against Comerica were subsequently dismissed. Auto-Owners assigned to plaintiffs any claims it had against the other defendants, and the claims against it were dismissed as were the claims against AM Adjusting. Plaintiffs alleged in their complaint that Willis and his businesses were not entitled to compensation for the work they performed because Willis was unlicensed and their contract was therefore void, that Willis had defrauded them, had conducted the restoration in an unworkmanlike manner, and had converted their insurance proceeds. Plaintiffs further alleged that Denaglen wrongfully cashed the insurance checks and converted the funds

paid by Auto Owners to plaintiffs. Denaglen failed to timely respond to plaintiffs' complaint and a default judgment was entered against it. The court, Michael F. Sapala, J., denied Denaglen's motion to set aside the default. The remaining parties moved for summary disposition. The court granted summary disposition in favor of plaintiffs. Willis and his businesses and Denaglen appealed. The Court of Appeals, GLEICHER, P.J., and SAWYER and FORT HOOD, JJ., affirmed in an unpublished opinion per curiam. Willis and his businesses and Denaglen then sought leave to appeal in the Michigan Supreme Court. The Supreme Court ordered and heard oral argument on whether to grant the application or take other peremptory action. 496 Mich 853 (2014).

In a unanimous opinion by Justice MARKMAN, the Supreme Court *held*:

MCL 339.2412(1) does not prevent an unlicensed builder from defending against a lawsuit on its merits. Nor does the statute afford a homeowner an independent cause of action to seek damages for its violation. Contracts between an innocent homeowner and an unlicensed residential builder are voidable by the homeowner, and thereby effective in conveying rights and authorities to both parties and third parties. The Court of Appeals therefore erred when it declared the contract at issue void *ab initio*.

1. MCL 339.2412(1) prohibits an unlicensed residential builder from bringing or maintaining an action for the collection of compensation by filing or pursuing a complaint, cross-claim, counterclaim, or third-party claim against a homeowner. However, if it is the homeowner who seeks compensation or performance from the unlicensed builder, the homeowner has brought the action. And if the builder offers reasons why the homeowner should not recover in its action, the builder has asserted a defense and the assertion of a defense is not barred by MCL 339.2412(1).

2. MCL 339.2412(1) does not afford a homeowner a separate and independent right to demand that an unlicensed builder return funds paid for work conducted when the builder lacked the requisite license. The statute was written to protect a homeowner by imposing a burden on a builder who, in the Legislature's view, would endanger public safety by performing construction work without a license. However, a homeowner is protected from the harm that may result from the performance of unlicensed work— i.e., the provision of unsatisfactory or unsafe building services— through existing and traditional common-law causes of action in tort and contract. In addition, MCL 339.2412 expressly provides a mechanism for its enforcement, apart from civil liability,

by providing for civil prosecution by the Attorney General or a prosecuting attorney. By expressly conferring enforcement authority only on prosecutors and the Attorney General, the statute would seem by implication not to give similar authority to a private party. Given these facts, there is no basis for inferring a private cause of action to enforce MCL 339.2412(1).

3. The courts of this state have often pronounced contracts involving an unlicensed builder to be "void," but it appears that in many cases, courts have stated that these contracts are "void" without actually intending to use the term in its literal sense as evidenced by the fact that courts have shown a willingness to allow a homeowner to enforce such contracts against an unlicensed builder. In addition, while MCL 339.2412(1) imposes a limitation on the unlicensed builder, preventing the builder from bringing any kind of lawsuit in order to receive compensation for work performed without a license, the statute does not place any similar limitation on the acts that may be taken by a homeowner. The statute therefore suggests that contracts between a homeowner and an unlicensed builder are characterized by an asymmetrical enforceability. This statutory framework is largely in accordance with the nature of a voidable contract because in the case of a voidable contract, the party with the power of avoidance has the unilateral option to either rescind the contract and avoid the obligation of performance, or to ratify the contract and render it enforceable. Although there has been considerable confusion regarding the proper legal status of these contracts, treating them as voidable is the only outcome that satisfactorily applies MCL 339.2412(1) while giving due consideration to our judicial precedents.

4. The trial court did not abuse its discretion by refusing to set aside Denaglen's default. Even after receiving notice of its default, Denaglen inexplicably waited seven weeks before moving to have the default set aside. In arguing Denaglen's motion to set aside the default, and in their applications for leave to appeal, the parties presented irreconcilable accounts of the circumstances surrounding the default. It was for the trial court to evaluate the credibility and reasonableness of the parties' arguments, and it determined that Denaglen had not made the necessary showing to merit relief from the default. However, because this opinion calls into question the legal justifications for the lower courts' decisions in favor of plaintiffs' conversion claims against defendants, the potential for an inconsistent result exists. If Willis is not liable for converting the insurance checks, then logically Denaglen could not have converted the checks, either. In

the face of such an outcome, Denaglen's default, as to the conversion claim only, would need to be set aside.

5. The contract between Willis (the unlicensed builder), and plaintiff homeowners was voidable. Because the contract was not a nullity from the outset, it could in theory have conveyed to Willis the authority to receive, indorse, and cash the insurance checks. The trial court, however, granted plaintiffs summary disposition without deciding whether the contract, if valid, would have conferred that authority on Willis. We therefore remand to that court for a determination of whether the agreement granted Willis and his companies the specific authority to perform those actions on plaintiffs' behalf and whether they acted within the scope of that authority. If on remand the trial court determines that Willis and his companies might be liable for any of plaintiffs' claims arising under the contract, those defendants must be permitted to defend against those claims. Neither Willis's breach of the contract nor MCL 339.2412(1) prevent Willis from demanding that plaintiffs prove their actual damages. If plaintiffs seek judicial redress, including damages, they are required to prove the extent to which they have been harmed by defendants and defendants are entitled to rebut those proofs. With regard to any outstanding equitable claims, such as restitution, plaintiffs must also be prepared to establish that they have acted equitably.

*Affirmed in part, reversed in part, and remanded.*

1. LICENSES — BUILDING CONTRACTS — PROHIBITION AGAINST ACTIONS BY UNLICENSED BUILDERS — ACTIONS BY THE HOMEOWNER — ASSERTION OF A DEFENSE BY THE BUILDER.

    MCL 339.2412(1) prohibits an unlicensed residential builder from bringing or maintaining an action for the collection of compensation by filing or pursuing a complaint, cross-claim, counterclaim, or third-party claim against a homeowner; the assertion of a defense by a builder in an action brought by the homeowner is not barred by MCL 339.2412(1).

2. LICENSES — BUILDING CONTRACTS — PROHIBITION AGAINST ACTIONS BY UNLICENSED BUILDERS — PRIVATE CAUSES OF ACTION BY THE HOME-OWNER.

    MCL 339.2412(1) does not afford a homeowner a separate and independent right to demand that an unlicensed builder return funds paid for work conducted when the builder lacked the requisite license.

3. Licenses — Building Contracts — Prohibition Against Actions by Unlicensed Builders — Voidable Contracts.

   Contracts involving an innocent homeowner and an unlicensed residential builder are voidable, not void *ab initio* (MCL 339.2412(1)).

*Posner, Posner and Posner* (by *Gerald F. Posner*) for Danny and Joyce Epps.

*Roger L. Premo* for 4 Quarters Restoration LLC, Denaglen Corp., Emergency Insurance Services, and Troy Willis.

MARKMAN, J. Defendants, an unlicensed residential builder; his businesses; and Denaglen Corp., a check-cashing service, seek leave to appeal the decision of the Court of Appeals denying them relief from summary disposition. The trial court entered judgment in favor of plaintiffs, a married couple and parties to a home restoration contract with the unlicensed builder defendant and his businesses, and the Court of Appeals affirmed. We directed that oral arguments be held to address whether to grant the application for leave to appeal or take other action pursuant to MCR 7.302(H)(1). *Epps v 4 Quarters Restoration, LLC*, 496 Mich 853 (2014). After hearing arguments on March 10, 2015, defendants' application is now considered. This case raises four issues: (1) whether MCL 339.2412(1), which prohibits an unlicensed builder from "bring[ing] or maintain[ing] an action . . . for the collection of compensation" prevents an unlicensed builder from defending on the merits against claims asserted against him by a homeowner; (2) whether MCL 339.2412(1) provides a homeowner with an independent cause of action for damages arising from the statute's violation; (3) whether a contract for the services of an unlicensed builder is void *ab initio* or whether it may have some

form of continuing legal existence; and (4) whether the trial court abused its discretion in refusing to set aside the default of Denaglen Corp., the check-cashing service. In lieu of granting leave to appeal, we affirm in part and reverse in part the judgment of the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

## I. FACTS AND HISTORY

Plaintiffs Danny and Joyce Epps own a home in Detroit. On July 26, 2006, that home was damaged in a flood. Plaintiffs' home insurance provider, Auto-Owners Insurance Company, employed AM Adjusting for the purpose of referring plaintiffs to professionals capable of performing the necessary restoration work. AM Adjusting referred plaintiffs to defendant Troy Willis and his companies, 4 Quarters Restoration and Emergency Insurance Services. Willis met with plaintiffs and showed them a book depicting some of his work. The book also displayed a copy of Willis's residential builder's license, although Willis neglected to inform plaintiffs that the license had been revoked on January 31, 2006.

Plaintiffs subsequently decided to hire Willis to perform restoration services on their home and on personal property damaged in the flood, and the parties signed a misnamed "Fire Repair Agreement" to that effect on July 26, 2006.[1] That agreement states that plaintiffs:

> assign[] the proceeds of the adjusted [insurance] claim to the Emergency Insurance Services [Willis's company], as full payment for the fire repairs.

\* \* \*

---

[1] Capitalization and emphasis altered.

The owner, the undersigned, is not liable for anything in excess of the insurance check. The owner is to approve specifications before work is started, endorsement of the [insurance checks] to Emergency Insurance Services, will be payment in full for the . . . repairs.[2]

An addendum, titled "Work Authorization,"[3] states in relevant part:

To the Insurance Companies, their agents, or to Whom it may Concern:

I/We, Danny & Joyce Epps, the undersigned, hereby irrevocably engage 4 Quarters Restoration LLC., to make all necessary restoration and or clean damage [to the] property caused by your loss occurring on the 26th day of July 2006. To the property owned by the undersigned located at . . . City Detroit, State Michigan.

The undersigned to insure payment, assigns the proceeds of the adjusted claim to 4 Quarters Restoration LLC., as full payment for cleaning and or restoration.[4]

Another addendum, titled "Insurance Power of Attorney,"[5] was signed by plaintiffs and contained the following language:

To: The Insurance Companies

Their Agents

All Concerned Parties

I Danny Epps & Joyce Epps, hereby give my (Contractor), Troy Willis Power of Attorney, to sign my name to all documents pertaining to settling the insurance claim and restoring the damage to my property . . . .[6]

---

[2] Capitalization and emphasis altered.

[3] Emphasis altered.

[4] Emphasis altered.

[5] Emphasis altered.

[6] Emphasis altered.

Willis began work on plaintiffs' home, and also began making insurance claims through plaintiffs' homeowners' policy. Plaintiffs were aware that Willis was filing claims on their behalf, although they assert they were unaware of the amounts of these claims. Upon approving the claims, Auto-Owners sent checks directly to Willis. Sometimes these checks listed both Willis and the plaintiffs as payees, and at other times only the plaintiffs were listed as payees. When Willis received the checks, he indorsed them himself, signing plaintiffs' names. In total, Willis received and indorsed checks from Auto-Owners equaling $128,047. Upon receiving and endorsing the checks, he then cashed these at Denaglen's check-cashing business, MBM Check Cashing.[7] Denaglen charged Willis a 3% fee for providing its services. After Willis had indorsed the checks to Denaglen, the latter deposited the funds into its account at Comerica Bank. By the end of 2006, Willis had apparently discontinued work on plaintiffs' home. The parties dispute both whether the restoration had been completed and whether the work had been performed in a satisfactory manner.

On July 24, 2009, plaintiffs filed the present action in the Wayne Circuit Court against all the individuals and businesses involved in either the restoration of their home or with the flow of monies associated with the project, including Willis and his businesses, Denaglen Corp., Comerica, Auto-Owners, and AM Adjusting. Comerica Bank filed an interpleader action and deposited $128,047 from Denaglen's account into escrow and the claims against Comerica were dismissed. Auto-Owners Insurance assigned to plaintiffs

---

[7] Although Willis cashed the checks at MBM Check Cashing, that entity is an alter ego of Denaglen Corp. Because the parties refer to this defendant as "Denaglen," this opinion will do the same.

any claims it had against the other named defendants and the claims against it were also dismissed, as were the claims against AM Adjusting.

As to Willis and his businesses, plaintiffs alleged that these parties performed restoration services on plaintiffs' home absent the requisite license and therefore were not entitled to receive compensation for their services. Plaintiffs sought to have the agreement between them and Willis had declared "illegal, void and unenforceable" and thereby rescinded. Plaintiffs further alleged that Willis defrauded them, carried out their restoration in an unworkmanlike manner, and converted the proceeds of their insurance checks. Regarding the latter claim, plaintiffs sought treble damages measured by the face value of the insurance checks.

With regard to Denaglen, plaintiffs alleged that it wrongfully cashed the insurance checks, acted in bad faith and without employing reasonable commercial standards, and converted the funds paid by Auto-Owners to plaintiffs. As a result, plaintiffs sought the $128,047 placed into escrow by Comerica. Denaglen failed to file a timely answer to plaintiffs' complaint and a default judgment against it was entered. Denaglen subsequently moved to have the default set aside, but the trial court denied the motion.

The parties filed competing motions for summary disposition. The trial court granted plaintiffs' motion and denied defendants' motion, ordering that the escrow funds be awarded to plaintiffs. The court explained its ruling by stating, "MCL 339.2412(1) is applicable in this case and Plaintiffs are entitled to summary disposition as a matter of law." The trial court finally held that defendants were liable as a matter of law for converting the insurance checks issued by Auto-Owners.

Defendants appealed, and the Court of Appeals affirmed albeit on different grounds. The Court of Appeals disagreed with the trial court that MCL 339.2412(1) mandated judgment in plaintiffs' favor, noting that MCL 339.2412(1) states only that an unlicensed builder may not " 'bring or maintain an action . . . for the collection of compensation . . . .' " *Epps v 4 Quarters Restoration, LLC*, unpublished opinion per curiam of the Court of Appeals, issued June 6, 2013 (Docket No. 305731), p 4. Because defendants did not "bring or maintain an action," but sought only to defend against plaintiffs' action, MCL 339.2412(1) did not impose liability on defendants. *Id.* The Court also held that the statute did not afford plaintiffs a private cause of action to seek damages for its violation, but rather that a homeowner aggrieved by a builder's unlicensed work was obligated to seek damages under traditional common-law contract and tort theories. *Id.* at 5-6.

The Court of Appeals nonetheless affirmed summary disposition in favor of plaintiffs because it believed that defendants had converted the proceeds of the insurance checks. The Court noted that Willis had misrepresented himself to plaintiffs as a licensed builder and held that "Willis's fraud rendered the power of attorney entered by the [plaintiffs] void *ab initio*." *Id.* at 6. Accordingly, it concluded that "Willis therefore had no authority to endorse and negotiate checks issued by the insurance company on the [plaintiffs'] behalves." *Id.* The Court agreed with the trial court that the proper measure of damages for the conversion was the face value of the converted instruments and affirmed the lower court's order distributing the funds held in escrow to plaintiffs.

Defendants sought leave to appeal in this Court, contending that the Court of Appeals erred by finding defendants liable for conversion as a matter of law and

also that the trial court abused its discretion when it failed to set aside Denaglen's default. Plaintiffs filed a cross-appeal, conditioned upon this Court granting defendants' application for leave to appeal, contending that the Court of Appeals erred when it held both that MCL 339.2412(1) did not provide plaintiffs with a private cause of action to recover the funds paid to Willis and that Willis was entitled under the statute to defend himself against plaintiffs' claims.

## II. STANDARD OF REVIEW

This case involves matters of statutory and contract interpretation, which are reviewed de novo. *Sands Appliance Servs v Wilson*, 463 Mich 231, 238; 615 NW2d 241 (2000). A trial court's ruling on a motion for summary disposition is also reviewed de novo. *Costa v Community Emergency Med Servs, Inc*, 475 Mich 403, 416; 716 NW2d 236 (2006). A trial court's decision regarding a motion to set aside a default judgment is reviewed for an abuse of discretion. *Lawrence M Clarke, Inc v Richco Constr, Inc*, 489 Mich 265, 272; 803 NW2d 151 (2011). An abuse of discretion occurs when the court's decision results in an outcome that falls outside the range of principled outcomes. *Barnett v Hidalgo*, 478 Mich 151, 158; 732 NW2d 472 (2007).

## III. ANALYSIS

### A. ABILITY TO DEFEND

The trial court granted summary disposition in favor of plaintiffs because it believed that MCL 339.2412(1) mandated that result. The Court of Appeals disagreed, holding that the statute does not apply because it only operates to prevent an unlicensed builder from *"bring[ing] or maintain[ing]"* claims

against a homeowner. The statute does not, however, prevent an unlicensed builder from *defending* itself against a claim on its merits. Because it was the homeowners bringing claims against the builder in the instant case, MCL 339.2412(1) is inapplicable. We agree with that analysis.

MCL 339.2412(1) states:

> A person or qualifying officer for a corporation or member of a residential builder or residential mainte-nance and alteration contractor shall not bring or main-tain an action in a court of this state for the collection of compensation for the performance of an act or contract for which a license is required by this article without alleging and proving that the person was licensed under this article during the performance of the act or contract.

"The primary goal of statutory interpretation is 'to ascertain the legislative intent that may be reasonably inferred from the words expressed in the statute.' " *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 427; 751 NW2d 8 (2008), quoting *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 420; 662 NW2d 710 (2003). When the language of a statute is clear, it is presumed that the Legislature intended the meaning expressed therein. *Allison*, 481 Mich at 427. If a statute does not define a word, it is appropriate to consult dictionary definitions to determine the plain and ordinary meaning of the word. *Id.*, citing *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). Legal terms, however, are to be construed according to their "peculiar and appropriate meaning in the law." MCL 8.3a.

MCL 339.2412(1) prohibits an unlicensed builder from "bring[ing] or maintain[ing] an action . . . for the collection of compensation . . . ." The Court of Appeals was correct in holding the statute inapplicable here; it

does not bar the compensation itself, but only an "action" to collect it. An "action" is defined as "a lawsuit brought in court; a formal complaint within the jurisdiction of a court of law." *Black's Law Dictionary* (6th ed). "Cause of action" is similarly defined as, "[t]he fact or facts which give a person a right to judicial redress or relief against another. . . . A situation or state of facts which would entitle a party to sustain action and give him right to seek a judicial remedy in his behalf." *Id.* A party may assert a cause of action by filing a "complaint, cross-claim, counterclaim, or third-party claim . . . ." MCR 2.111(F)(2).

By contrast, a "defense" is "[t]hat which is offered and alleged by the party proceeded against in an action or suit, as a reason in law or fact why the plaintiff should not recover or establish what he seeks; [t]hat which is put forward to diminish plaintiff's cause of action or to defeat recovery." *Black's Law Dictionary* (6th ed). It is not an action, such as a complaint, cross-claim, counterclaim, or third-party claim, but rather an assertion made in *response* to an action. Therefore, a party may bring an "action" seeking compensation by filing a complaint and the adverse party may then assert a "defense" as a reason why the complainant should not recover what he or she seeks or otherwise prevail in the action. An "action" and a "defense" are separate assertions and are essentially a call and a response, the assertion of the former preceding and triggering the latter. A party bringing an "action" seeks to recover from the opposing party, while a party asserting a "defense" seeks to "diminish" or "defeat" that action.

In the context of litigation involving an unlicensed builder, MCL 339.2412(1) bars an unlicensed builder from seeking compensation by pursuing a complaint,

cross-claim, counterclaim, or third-party claim against a homeowner. In these circumstances, the unlicensed builder would be asking the court to order the homeowner to pay some amount allegedly due. However, if it is the homeowner who seeks compensation or performance from the unlicensed builder, the homeowner has brought the "action." And if the builder offers reasons why the homeowner should not recover in its action, the builder has asserted a "defense" and the assertion of a defense is not barred by MCL 339.2412(1).

Further supporting the conclusion that MCL 339.2412(1) does not impair an unlicensed builder's ability to *defend* himself or herself from litigation, the statute forbids actions for the "collection of compensation[.]" *The American Heritage Dictionary of the English Language* (New College ed, 1981) defines "collect" as "to call for and obtain payment of." When an unlicensed builder defends against an action by a homeowner to recover sums paid, the builder does not seek to "collect" compensation; rather, the builder presumably seeks to *retain* compensation already possessed. Any other interpretation would mean that a defendant in a lawsuit who asserts a successful defense has somehow "collected" from the plaintiff. While it is true that in many cases, as here, the unlicensed builder may have previously collected some amount of payment from the homeowner, MCL 339.2412(1) only prohibits actions "in a court of this state" for the collection of compensation. Any collection of payment that occurred before the litigation was not accomplished by an "action in a court" and therefore does not come within the scope of MCL 339.2412(1).

We also concur with the Court of Appeals in *Parker v McQuade Plumbing & Heating, Inc*, 124 Mich App 469, 471; 335 NW2d 7 (1983), in which the following

was said of MCL 339.2412(1): "The statute removes an unlicensed contractor's power to sue, not the power to defend, [and] was intended to protect the public as a shield, not a sword." This, we believe, constitutes the most reasonable interpretation of the statute, and when a statute is plain and unambiguous, it must be applied as written and without judicial gloss. *Wayne Co v Hathcock*, 471 Mich 445, 456; 684 NW2d 765 (2004). MCL 339.2412(1) operates as a bar to actions, not a bar to defenses. It prevents an unlicensed builder from attempting to "collect" payment from a homeowner through the filing of "actions" in a court of law. It does not, however, prevent an unlicensed builder from seeking to "diminish" or "defeat" actions filed against the builder by arguing that the claimant has not been damaged by the builder to the extent alleged.[8]

---

[8] Plaintiffs support their argument that an unlicensed builder may not defend itself under MCL 339.2412(1) by citing *Roberson Builders v Larson*, unpublished opinion per curiam of the Court of Appeals, issued September 19, 2006 (Docket No. 260039), lv den 482 Mich 1138 (2008), as well as Justice MARILYN KELLY's concurring statement to this Court's order denying leave to appeal, *Roberson Builders v Larson*, 482 Mich 1138 (2008). The Court of Appeals refused to allow an unlicensed builder to argue for a reduction in the amount of a homeowner's damages claim arising from allegedly poor workmanship. The builder had provided services for which it had not been paid. When litigation arose, the builder sought to use the value of unpaid services not contemplated by the contract to reduce the homeowner's recovery. The Court essentially treated the builder's argument as a separate claim for compensation for the additional work performed: "At issue is whether the trial court erred when it allowed [the builder] to present evidence that it was entitled to recover the unpaid balance of the contract, as well as payment for extra work performed that was not included in the original contract." *Roberson*, unpub op at 2. We believe the Court's distinction to have been artificial; the builder did not seek to defend the portion of the contract that it did not perform or to collect for the portion of the contract that it did perform; rather, it sought only to challenge the homeowner's alleged damages arising from its deficient performance. By pointing out that it was not paid for other services that it provided, the builder sought only to show that the homeowner had not been damaged to the extent alleged. It was not maintaining an "action"

### B. PRIVATE CAUSE OF ACTION

The Court of Appeals concluded that MCL 339.2412(1) does not give rise to a private cause of action that a homeowner may bring against an unlicensed builder. Plaintiffs argue that the statute should be interpreted to allow a homeowner to bring a private cause of action seeking the disgorgement of monies paid to an unlicensed builder. We agree, however, with the analysis of the Court of Appeals that MCL 339.2412(1) does not afford a homeowner a separate and independent right to demand that an unlicensed builder return funds paid for work conducted when the builder lacked the requisite license.

---

for compensation; rather, it was seeking only to reduce the amount of damages that the homeowner could collect, and its argument was asserted in a purely defensive context.

Justice KELLY similarly believed that MCL 339.2412(1) prevented the contractor in *Roberson* from arguing for a reduction in the amount owed to the homeowner. She cited *Black's Law Dictionary* (8th ed), defining "action" to include any " 'civil or criminal judicial proceeding,' " and cited MCL 440.1201, defining "action" to include " 'recoupment[s], counterclaim[s], setoff[s], suit[s] in equity, and any other proceedings in which rights are determined.' " *Roberson*, 482 Mich at 1139 (emphasis omitted). She concluded that the builder's argument for a reduction in its liability was actually a "setoff," and that if the builder was allowed to so argue, it would be collecting "compensation" for work it performed while unlicensed. *Id.* at 1139-1140. But as with the Court of Appeals, she treated the builder's argument regarding the value it provided the homeowner as separate and distinct from the circumstances that formed the basis for the homeowner's lawsuit. However, there was a *single* transaction in *Roberson*—the builder's performance of building services. We respectfully believe that Justice KELLY's definition of an "action" also comes into tension with the term "defense," which *Black's Law Dictionary* (6th ed) has defined as "[t]hat which is put forward to diminish plaintiff's cause of action or to defeat recovery[.]" Put simply, in *Roberson* the homeowner alleged that the builder's actions had impaired the value of his property by a certain amount. The builder should have been allowed to argue that the homeowner's actual damages were less than that amount, thus merely "diminish[ing]" the homeowner's recovery.

MCL 339.2412(1) clearly does not create an *express* private cause of action, given that by its terms it only purports to *preclude* certain actions by an unlicensed builder. Nonetheless, it is sometimes possible that a court can *infer* a private cause of action from a statute when necessary to remediate its breach. Such an inference is appropriate when the statute provides no express remedy for its violation, yet it is deemed, exclusively or in part,

> (a) to protect a class of persons which includes the one whose interest is invaded; (b) to protect the particular interest which is invaded; (c) to protect that interest against the kind of harm which has resulted; and (d) to protect that interest against the particular hazard from which the harm results. [*Lash v Traverse City*, 479 Mich 180, 192-193; 735 NW2d 628 (2007), quoting cases quoting 2 Restatement Torts, 2d, § 286, p 25 (quotation marks omitted).]

We find no basis here for inferring a private cause of action to enforce MCL 339.2412(1). Clearly, the statute was written to protect homeowners, such as plaintiffs in this case, by imposing a burden on a builder who in the Legislature's view would endanger the public safety by performing construction work without a license. However, a homeowner is protected from the harm that may result from the performance of unlicensed work—i.e., the provision of unsatisfactory or unsafe building services—through existing and traditional common-law causes of action in tort and contract. Therefore, even if MCL 339.2412(1) did not exist, an unlicensed builder could be held liable for the consequences of poorly performed construction work.

Furthermore, MCL 339.2412 expressly provides a mechanism for its enforcement, apart from civil liability:

> A prosecuting attorney and the attorney general may bring an action for a civil violation in a court of competent jurisdiction against a person not licensed under this article that has violated [MCL 339.601 or MCL 339.602]. The court shall assess a civil fine, to be paid to the prosecuting attorney or the attorney general bringing the action, of not less than $5,000.00 and not more than $25,000.00, aside from any civil damages or restitution. [MCL 339.2412(4).]

By expressly conferring enforcement authority only on prosecutors and the Attorney General, the statute would seem by implication not to confer similar authority on a private party.[9] MCL 339.2412(1) was written, as its terms make reasonably clear, to impose a *burden* on an unlicensed builder, not—except indirectly by its restriction of lawsuits by the builder against the homeowner—to afford a *benefit* to a homeowner.

In summary, (a) MCL 339.2412(1) prevents an unlicensed builder from bringing "actions," i.e., claims, counterclaims, cross-claims, and third-party claims, to collect compensation for services performed in violation of our state's licensing requirements; (b) MCL 339.2412(1) does not, however, prevent an unlicensed builder from defending on the merits against an action brought by a homeowner seeking to recover sums already paid to the builder;[10] and (c) MCL 339.2412(1)

---

[9] See *Claire-Ann Co v Christenson & Christenson, Inc*, 223 Mich App 25, 30-31; 566 NW2d 4 (1997):

> Michigan jurisprudence holds that where a statute creates a new right or imposes a new duty unknown to the common law and provides a comprehensive administrative or other enforcement mechanism or otherwise entrusts the responsibility for upholding the law to a public officer, a private right of action will not be inferred.

[10] We are not oblivious to the fact that this understanding of the statute creates a potential anomaly: an unlicensed builder may receive

does not create a private cause of action allowing a homeowner to bring claims against an unlicensed builder. The statute has but one purpose—to prevent an unlicensed builder from "bring[ing] or maintain-[ing] . . . action[s] . . . for the collection of compensation . . . ."

### C. STATUS OF CONTRACT

We must next assess the legal character of the purported contract between plaintiffs and Willis.[11] Plaintiffs argue that the restoration contract was illegal and therefore void *ab initio* because it contemplated the performance of an illegal act—the provision of construction services by an unlicensed builder in violation of MCL 339.601.[12] Plaintiffs thereby argue that the contract, in effect, never came into existence and was a nullity from the outset and thus could not confer rights or obligations on either of the parties.[13]

_____

compensation for illegally provided services, be sued by the homeowner, and by an effective defense be able to retain some portion of that compensation, even though it would not have been able affirmatively to seek that compensation by filing a lawsuit if the homeowner had simply refused to pay. However, this is the result that the statute mandates.

[11] We note that there is no indication in the record that plaintiffs knew about defendants' unlicensed status. Accordingly, our analysis in this case is limited to determining the legal status of a contract between an "innocent" homeowner and an unlicensed builder. Cf. *Stokes v Millen Roofing Co*, 466 Mich 660; 649 NW2d 371 (2002); *Leland v Ford*, 245 Mich 599, 609-610; 223 NW 218 (1929).

[12] "A person shall not engage in or attempt to engage in the practice of an occupation regulated under this act [including residential building services] or use a title designated in this act unless the person possesses a license or registration issued by the department for the occupation." MCL 339.601(1).

[13] See *Alexander Bros v Weishuhn*, 166 Mich 532, 536; 131 NW 1107 (1911) (" 'If the contract is held to be void, title never passed. . . . [And] neither party could enforce their rights. Neither party would have rights under it.' "), quoting the trial court ruling; *Mich Mut Auto Ins Co v*

Defendants disagree and argue that the contract was merely voidable at the option of plaintiffs. If that were the case, the contract would be valid and enforceable unless and until plaintiffs themselves exercised their option to rescind it.[14]

The legal status of the instant contract—implicating the distinction between a "void" contract, a "voidable" contract, and a valid and enforceable contract—is crucial in resolving the underlying dispute because it determines whether the Court of Appeals correctly held that, as a matter of law, defendants here *converted* the insurance checks drawn by Auto-Owners. "Void" is defined as: "[n]ull; ineffectual; nugatory; having no legal force or binding effect . . . ." *Black's Law Dictionary* (6th ed). "Void contract" is similarly defined as: "[a] contract that does not exist at law; a contract having no legal force or binding effect. . . . [S]uch contract creates no legal rights and either party thereto may ignore it at his pleasure, insofar as it is executory." *Id*. In

*Reddig*, 129 Mich App 631, 635; 341 NW2d 847 (1983) ("Since the sale, unaccompanied by the delivery of the certificate of title, was in violation of the statute, . . . it was void and . . . the seller remained the owner of the vehicle.").

[14] See *Poli v Nat'l Bank of Detroit*, 355 Mich 17, 19-20; 93 NW2d 925 (1959) (stating that when a contract is voidable, it is valid until the party with the option to avoid the contract exercises that option). See also *Whitcraft v Wolfe*, 148 Mich App 40, 52-53; 384 NW2d 400 (1985) (stating that when a contract is induced by fraud, it is merely voidable, and the aggrieved party may choose to either rescind the contract and seek return of the property, or sue for damages caused by the fraud); *Semmens v Floyd Rice Ford*, 1 Mich App 395, 401; 136 NW2d 704 (1965) (concluding that a minor who had executed a voidable contract to purchase an automobile had legal responsibility for its use, and the seller did not regain responsibility for the vehicle until after the contract was voided); *Jack Mann Chevrolet Co v Assoc Inv Co*, 125 F2d 778, 784 (CA 6, 1942) ("When a party has entered into a voidable contract and wishes to be restored to the rights he possessed before the contract was executed, he must promptly disaffirm the contract . . . .").

contrast, "voidable" is defined as: "[t]hat which may be avoided, or declared void; not absolutely void, or void in itself[,]" while a "voidable contract" is defined as: "[a] contract that is valid, but which may be legally voided at the option of one of the parties. . . . One which can be avoided (cancelled) by one party because a right of rescission exists as a result of some defect or illegality (*e.g.*, fraud or incompetence)." *Id.* Finally, a valid and enforceable contract is, of course, simply a contract lacking any inherent flaws that would impair a party's ability to enforce it.

Plaintiffs argue, and the Court of Appeals held,[15] that the instant contract was void *ab initio*. Because

---

[15] The Court of Appeals' analysis conflated distinct contractual concepts: voidness for illegality and fraud in the inducement. Courts have long stated that illegal contracts are void. See, e.g., *McNamara v Gargett*, 68 Mich 454, 462; 36 NW 218 (1888) ("If any part of a consideration is illegal, the whole consideration is void, because public policy will not permit a party to enforce a promise which he has obtained by an illegal act or promise . . . ."). The parties agree that a critical question before this Court is whether Willis's status as an unlicensed builder renders the restoration contract void. The Court of Appeals, however, suggests that the contract was void because it was induced by Willis's fraudulent assertion that he was a licensed residential builder when in fact he was not. "Willis's *fraud* rendered the power of attorney entered by the Epps[es] void *ab initio*." *Epps*, unpub op at 6 (emphasis added). When a party fraudulently induces another to enter into a contract, that contract is voidable at the option of the defrauded party and is not void. *Dunn v Goebel Brewing Co*, 357 Mich 693, 697; 99 NW2d 380 (1959). Insofar as the Court of Appeals suggested that Willis's fraud rendered the contract void, it was mistaken. However, the Court of Appeals also cited for support *Wedgewood v Jorgens*, 190 Mich 620, 622; 157 NW 360 (1916), which held that contracts made in violation of licensing statutes are illegal and "void." In so doing, it appears the Court failed to distinguish between contracts rendered voidable by fraud in the inducement, and contracts that contemplate services in violation of a licensing statute. The latter flaw in the contractual relationship—the violation of the licensing statute—is dispositive in this case. If Willis had, in fact, been licensed, but had otherwise fraudulently induced plaintiffs into entering the contract, it is clear that under the rule in *Dunn* the contract would have been voidable at plaintiffs' option.

the contract was a nullity from the outset, it could not as a matter of law grant any authority to Willis. Consequently, the Court of Appeals held that summary disposition in favor of plaintiffs on their conversion claim was appropriate. Because of this, it was unnecessary for the Court of Appeals to assess plaintiffs' fraud and breach of contract claims against Willis.

If plaintiffs and the Court of Appeals are correct that the instant contract is void *ab initio*, then it could not as a matter of law have given Willis the right to receive, indorse, and cash the insurance checks because defendants contend that Willis possessed that authority pursuant to the contract's assignment and "power of attorney" addendums. According to defendants, because Willis's alleged fraud rendered the contract at most voidable, and because it is undisputed that plaintiffs never sought to rescind the contract before Willis performed his services, *at the time* he indorsed and cashed the checks, he possessed the authority to do so. If the contract is not *void ab initio*, then at least some question is raised as to whether the actual terms of the contract conferred on Willis the authority to receive, indorse, and cash the insurance checks on his own and without plaintiffs' knowledge.

In determining that the instant contract was void *ab initio*, the Court of Appeals not unreasonably cited past decisions of this Court stating as much. Unfortunately, the proper disposition of this issue—whether a restoration contract such as in this case was void, voidable, or lawful and valid under Michigan law—remains unclear. Courts in Michigan, as well as throughout the country, have treated contracts involving an unlicensed builder in a disparate and inconsistent fash-

ion.[16] Furthermore, although the courts of this state have often pronounced contracts involving an unlicensed builder to be "void," it appears that in many instances, courts have stated that particular types of contracts are "void" without employing that term in its actual sense.[17] So while a court may pronounce a contract "void," it may nonetheless have treated the contract as possessing some form of legal existence and import.

It is not altogether surprising that a lack of clarity has arisen surrounding the legal status of these particular kinds of contracts. In a typical dispute involving an unlicensed builder, the builder is attempting to enforce the contract against the homeowner and to recover compensation.[18] However, because the unli-

---

[16] See 5 Bruner & O'Connor, Construction Law, §§ 16:19 to 16:22 and cases cited therein.

[17] See, e.g., *Way v Root*, 174 Mich 418; 140 NW 577 (1913). In that case, the defendant husband executed a contract for the sale of real property without the consent of his wife, which was required by law. The purchaser sued for breach of contract, and the husband defended by arguing that the contract was void, citing *Naylor v Minock*, 96 Mich 182; 55 NW 664 (1893). The Court in *Way* conceded that the defendant correctly cited *Naylor* for the proposition that such contracts are void, but explained that " '[the] term "void" is perhaps seldom, unless in a very clear case, to be regarded as implying a complete nullity; it is, in a legal sense, subject to large qualifications, in view of all the circumstances calling for its application and the rights and interests to be affected in a given case.' " *Way*, 174 Mich at 425, quoting *Brown v Brown*, 50 NH 538 (1871). The Court then proceeded to hold that, although the contract was invalid as to its ability to convey title to real property, it remained valid as to its ability to support a claim for damages arising from its breach. *Way*, 174 Mich at 426.

[18] See, e.g., *Charles Featherly Constr Co v Prop Dev Group, Inc*, 400 Mich 198; 253 NW2d 643 (1977); *Bilt-More Homes, Inc v French*, 373 Mich 693; 130 NW2d 907 (1964); *Annex Constr, Inc v Fenech*, 191 Mich App 219; 477 NW2d 103 (1991); *Bernard F Hoste, Inc v Kortz*, 117 Mich App 448; 324 NW2d 46 (1982); *Chilson v Clevenger*, 12 Mich App 56; 162 NW2d 303 (1968).

censed builder is forbidden by MCL 339.2412(1) from asserting such an action, the court will determine that such a builder cannot enforce the contract. *Alexander v Neal*, 364 Mich 485, 489-490; 110 NW2d 797 (1961). In so ruling, the court will sometimes refer to the contract as "void." See, e.g., *Bilt-More Homes, Inc v French*, 373 Mich 693, 699; 130 NW2d 907 (1964). But in those cases, it is far from clear that the court actually intended to " 'imply [that the contract is] a complete nullity,' " devoid of any legal existence at any point in time. *Way v Root*, 174 Mich 418, 425; 140 NW 577 (1913) (citation omitted). Rather, the court merely might have determined that the contract could not be *enforced* by the unlicensed builder; it did not matter whether the contract was unenforceable because it was void *ab initio* or because some other legal impediment precluded enforcement. In cases proclaiming contracts with an unlicensed builder to be "void," the distinction between a genuinely void contract and a contract that is unenforceable but not altogether void did not often make a difference in the outcome. In the present case, however, that distinction matters.

An analysis of the law regarding the present contract must recognize and closely examine the lengthy line of precedent stating that contracts for the provision of construction services by an unlicensed builder are illegal and therefore void. As recently as 2002, this Court offered the following in *Stokes v Millen Roofing Co*, 466 Mich 660, 672; 649 NW2d 371 (2002): " 'Contracts by a residential builder not duly licensed are not only voidable but void—and it is not for a trial court to begin the process of attrition whereby, in appealing cases, the statutory bite is made more gentle . . . .' " That assertion was drawn from a quotation in *Bilt-More Homes, Inc v French*, 373 Mich 693, 699; 130 NW2d 907 (1964), which in turn cited *Alex-*

*ander*, 364 Mich at 487, for the proposition. *Alexander* was apparently the first case in which this Court interpreted a predecessor statute of MCL 339.2412(1); that statute forbade an unlicensed builder from "bring-[ing] or maintain[ing] an action in any court of this State for the collection of compensation for the performance of any act or contract for which a license is required . . . ." 1956 CL 338.986.[19] In *Alexander*, we held that a residential builder was barred from bringing an action to collect compensation for a roof he had installed absent the requisite license. We further opined that the licensing statute was enacted "to protect the public from incompetent, inexperienced, and fly-by-night contractors," and that "contract[s] made in violation of a police statute enacted for public protection [are] void and there can be no recovery thereon." *Id*. at 487 (citation omitted).

In holding the contract void, *Alexander* cited *Turner v Schmidt Brewing Co*, 278 Mich 464; 270 NW 750 (1936), which held that a builder could not recover for services provided in building a beer garden for an unlicensed alcohol vendor. *Turner* refused to enforce the contract, stating that " 'where statutes enacted to protect the public against fraud or imposition, or to safeguard the public health or morals, contain a prohibition and impose a penalty, all contracts in violation thereof are void.' " *Id*. at 469, quoting *Cashin v Pliter*, 168 Mich 386; 134 NW 482 (1912). " 'It is also well settled that, if a contract be void as against public policy, the court will neither enforce it while executory,

---

[19] However, the Michigan Legislature enacted laws requiring a residential builder to obtain a license before this statute was passed. See, e.g., *Sullivan v Graham*, 336 Mich 65, 66; 57 NW2d 447 (1953) (analyzing 1939 PA 311, as amended by 1945 PA 315, prohibiting a residential builder from providing services in counties with populations of more than 250,000 without having a license to do so).

nor relieve a party from loss by having performed it in part.' " *Turner*, 278 Mich at 470, quoting *Richardson v Buhl*, 77 Mich 632, 661; 43 NW 1102 (1889). On the basis of this Court's decision in *Turner*, a contract for the provision of services by an unlicensed builder has generally been characterized in our courts as a contract that is "illegal" or "against public policy." It is also clear that our cases have sometimes characterized such contracts as "void."[20] And Michigan is not alone in this regard; the courts of many states have similarly described contracts made in contravention of licensing statutes.[21]

The difficulty as pointed out by the Restatement of Restitution and Unjust Enrichment, is that courts

---

[20] See, e.g., *Krause v Boraks*, 341 Mich 149, 155; 67 NW2d 202 (1954), quoting *Jaenicke v Davidson*, 290 Mich 298, 298; 287 NW 472 (1939) (syllabus) (" 'All contracts which are founded on an act prohibited by a statute under a penalty are void although not expressly declared to be so and neither law nor equity will enforce a contract made in violation of such a statute or one that is in violation of public policy.' "); *McNamara v Gargett*, 68 Mich 454, 460; 36 NW 218 (1888) (" 'This rule, however, may be safely laid down, that wherever any contract conflicts with the morals of the time, and contravenes an established interest of society, it is void, as being against public policy.' "), quoting 1 Story, Contracts, § 675.

[21] See, e.g., *Dabbs v Four Tees, Inc*, 36 So 3d 542, 551 (Ala, 2008) (" 'If any person performs work within [the statutory definition of 'general contractor'] and fails to obtain a general contractor's license, the contract must be declared null, void, and unenforceable.' "), quoting *Herbert v Birmingham-Jefferson Civic Ctr Auth*, 694 F2d 240, 241 (CA 11, 1982); *Rasmus Constr Corp v Nagel*, 168 Misc 2d 520, 522; 646 NYS2d 926 (1996) ("Based upon the 'public safety' concerns underlying the Code licensing requirements, home improvement contracts entered into by such unlicensed entities are considered 'void.' "); *Elephant Lumber Co v Johnson*, 120 Ohio App 266, 268; 202 NE2d 189 (1964) ("The general rule is that a contract entered into by a person engaged in a business without taking out a license as required by law is void and unenforceable . . . ."); *Seaview Hosp, Inc v Medicenters of America, Inc*, 570 SW2d 35, 39 (Tex App, 1978) ("A contract for engineering services to be performed by a person who is prohibited from practicing engineering in Texas . . . is void, and being void, is unenforceable.").

have been known to be imprecise with their use of the term "void," and have on occasion mistakenly employed that term to describe a contract when what is actually meant is that a contract is voidable or otherwise unenforceable, and not that it is void *ab initio*. Thus, "the fact that a particular contract is described by statute or regulation as 'illegal,' 'unenforceable,' or 'void' is not necessarily the end of the inquiry . . . ." 1 Restatement Restitution & Unjust Enrichment, 3d, Illegality, § 32, comment *a*, p 507. As one commentator has observed of the law in this realm, "The law is littered with confusion when it comes to the concept of voidness." Schaefer, *Beyond a Definition: Understanding the Nature of Void and Voidable Contracts*, 33 Campbell L Rev 193, 194 (2010).

That confusion has permeated judicial opinions regarding contracts with an unlicensed residential builder. While courts often proclaim these contracts to be "void," see *Stokes*, 466 Mich at 672, they have also shown a willingness to allow a homeowner to enforce the contracts against an unlicensed builder. See, e.g., *H A Smith Lumber & Hardware Co v Decina*, 258 Mich App 419, 437; 670 NW2d 729 (2003), rev'd on other grounds, 471 Mich 925 (2004). Essentially, the courts of this state have on distinct occasions viewed such contracts both as a complete nullity and as enforceable against an unlicensed builder. Those propositions cannot both be true.

So it would seem that at the present a significant amount of uncertainty and inconsistency exists in our state's law regarding the legal status of contracts between a homeowner and an unlicensed residential builder. However, when faced with a legal question, our analysis must begin with any relevant statutes. *Detroit Auto Inter-Ins Exch v Gavin*, 416 Mich 407, 425; 331

NW2d 418 (1982). In this case, a statute is in place that governs the relationship between a homeowner and an unlicensed builder: MCL 339.2412(1). That statute, once again, provides that an unlicensed residential builder "shall not bring or maintain an action in a court of this state for the collection of compensation for the performance of an act or contract for which a license is required . . . ." It furthermore imposes a limitation on the unlicensed builder, preventing him from bringing any kind of lawsuit in order to receive compensation for work performed without a license. The statute does not place similar limitations on the actions that may be taken by the homeowner.

However, the statute does not directly address the question at hand—whether the contract between the unlicensed builder and the homeowner is void *ab initio* or voidable. Therefore, because the statute, on its face, cannot supply a complete answer, we must "determine and effectuate the intent of the Legislature through reasonable construction in consideration of the purpose of the statute and the object sought to be accomplished." *Gross v Gen Motors Corp*, 448 Mich 147, 158-159; 528 NW2d 707 (1995). Despite its lack of clarity on the instant matter, MCL 339.2412(1) allows us nonetheless to deduce several relevant inferences in our effort to discern the Legislature's intent.

First, it is relevant to look at the overall effect of MCL 339.2412(1). As explained, the statute imposes a limitation on an unlicensed residential builder. This Court has previously opined that the evident purpose of this limitation is to "protect the public from incompetent, inexperienced, and fly-by-night contractors." *Alexander*, 364 Mich at 487. It thus seems clear that the Legislature, in drafting MCL 339.2412(1), intended the statute to be protective of the homeowner's inter-

ests. So with that overarching purpose in mind, we inquire whether this purpose would be better served by treating contracts between an innocent homeowner and an unlicensed builder as void or voidable. We believe that this inquiry militates in favor of treating such contracts as voidable.

If the contract is void, a homeowner defrauded by an unlicensed builder has but a single remedial option: he or she can seek to undo the transaction and restore the *status quo ante*.[22] However, rescission might not be an entirely satisfactory remedy because it might well preclude the homeowner from receiving the full benefit of his or her bargain. That is, instead of undoing the transaction, the homeowner may find it more beneficial to seek damages for a builder's breach of contract. That remedy is only available, however, if the homeowner is entitled to enforce the *actual contract* against the builder. If the contract were to be treated as void, it would be a complete nullity and there would be nothing for the homeowner to enforce. Therefore, the statute's purpose in protecting the homeowner would seem to be significantly advanced by treating contracts between an innocent homeowner and an unlicensed builder as voidable rather than void.

---

[22] See *Groves v Jones*, 252 Mich 446, 450-451; 233 NW 375 (1930) ("Having determined that the parties are not *in pari delicto* [the parties are not equally culpable] in making a contract prohibited by the statute, it follows that the plaintiff is entitled to recover . . . the money he paid . . . ."); *Kuchenmeister v Dusza*, 218 Mich 497, 498; 188 NW 337 (1922) ("Where a void contract still remains executory, money paid under it may be recovered under the count for money had and received."), citing *De Croupet v Frank*, 212 Mich 465, 467; 180 NW 363 (1920); *Edward v Ioor*, 205 Mich 617, 625; 172 NW 620 (1919) ("When plaintiff's stock in the Arizona Piano Company, received on this void contract, was tendered back he was entitled to the stocks he had assigned in payment therefor. The transaction had been rescinded . . . .").

Second, it is relevant to look at the manner in which MCL 339.2412(1) refers to the business relationship between the homeowner and the unlicensed builder. The statute precludes an unlicensed contractor from bringing an action "for the collection of compensation for the performance of an act or *contract* for which a license is required . . . without alleging and proving that the person was licensed under this article during the performance of the act or *contract*." (Emphasis added.) The statute's very use of the term "contract" strongly implies that the Legislature did not intend for all contracts between a homeowner and an unlicensed builder to be rendered altogether void. Void contracts do not in effect exist; indeed, the very term "void contract" is an oxymoron because a contract that is void is not a contract at all. See *Black's Law Dictionary* (6th ed) (defining "void contract" as: "[a] contract that *does not exist* at law") (emphasis added). If the Legislature viewed all contracts between a homeowner and an unlicensed builder as void, it would have no reason to craft a statute preventing an unlicensed builder from enforcing "contracts;" there would be no contracts at all to enforce. We believe that the Legislature's use of the term "contract" further suggests that the contract at issue is voidable and not void.

Third, it is relevant to examine the manner by which MCL 339.2412(1) seeks to achieve its intended purpose. Which parties are affected by operation of the statute, and in what manner? As observed, MCL 339.2412(1) imposes a limitation on the unlicensed builder—he *alone* is denied the ability to bring lawsuits seeking compensation for unlicensed work. The statute therefore establishes that contracts between a homeowner and an unlicensed builder are characterized by an asymmetrical enforceability. The unlicensed builder is without authority to enforce the contract

against the homeowner, but the homeowner suffers no similar statutory disability. Thus, the statute leaves any power of enforceability there may be over the contract exclusively within the hands of the homeowner. This framework is largely in accordance with the nature of a voidable contract. As to such a contract, the party with the power of avoidance has the unilateral option to either rescind the contract and avoid the obligation of performance, or to ratify the contract and render it enforceable. *Whitcraft v Wolfe*, 148 Mich App 40, 52-53; 384 NW2d 400 (1986). A voidable contract, therefore, exhibits a distinctive one-sided enforceability. By contrast, a void contract exhibits a symmetrical unenforceability; both parties are equally denied the authority to enforce. We conclude that the asymmetrical effect of MCL 339.2412(1) further suggests that the contract at issue is voidable and not void.

Fourth, it is relevant to examine not only the words and phrases *present* in MCL 339.2412(1), but also the words and phrases that are conspicuously *absent*. It is clear that the statute was designed to limit the enforceability of contracts between the homeowner and the unlicensed builder. However, there is no indication that the Legislature intended to go so far as to mandate that all contracts with an unlicensed residential builder be deemed void *ab initio*. If the Legislature had intended that result, it could, without much difficulty, have said as much, as it has done in related contexts.[23]

Fifth, it is relevant that MCL 339.2412(1) says nothing regarding the rights or obligations of third parties. In many situations that can be contemplated, particularly with regard to agreements to build, a contract may

_____

[23] See, for example, MCL 451.414(1). There, the Legislature specifically provided that a contract to provide debt management services "made by a person without a license is *null and void*." (Emphasis added.)

serve to transfer rights to one of the parties upon which a third party might reasonably rely. In this case, for example, the contract purportedly gave Willis the right to receive, indorse, and cash insurance checks made out to plaintiffs. Denaglen argues that it relied on the contract's transfer of indorsement rights when it allowed Willis to cash the checks at its place of business. A contract may also directly give rights to third parties as intended beneficiaries. MCL 600.1405; *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 427-428; 670 NW2d 651 (2003). These and other third parties could potentially be harmed if contracts with an unlicensed builder were treated as void; they would be unable to rely on or enforce any transfers of rights or obligations under a void contract. It is therefore clear that by affecting the status of contracts between the homeowner and the unlicensed builder, MCL 339.2412(1) has the potential to inflict a considerable hardship on third parties. However, the statute is again conspicuously silent in this regard; if the Legislature had intended to impose such a hardship or risk on third parties to all contracts involving an unlicensed builder, it is reasonable to think that the Legislature would have offered some express indication to that effect. We believe the statute's silence in this respect further suggests that the contract at issue is voidable and not void.

In summary, we conclude that MCL 339.2412(1) more strongly supports the proposition that contracts between an innocent homeowner and an unlicensed builder are voidable, than that they are void *ab initio*. This conclusion receives further support from the caselaw of this state.[24] As previously explained, many Michigan cases have summarily and imprecisely re-

---

[24] When the proper application of a statute is less than clear, it is appropriate to supplement our understanding of the statute by referring

ferred to contracts with an unlicensed residential builder as "void."[25] However, those cases generally only prevented the builder from engaging the legal system to receive compensation for services performed without a license, while reinforcing the principle that an unlicensed builder may not enforce a building contract or recover the reasonable value of the builder's services through equity.[26] In those cases, it did not matter whether the contract was unenforceable because it was genuinely "void," or because it was unenforceable for some other reason but not a nullity from the outset. In addition, once the Legislature enacted the predecessor of MCL 339.2412(1), most cases ceased referring to contracts with an unlicensed builder as "void," and no longer analyzed their validity under the common law. Instead, courts simply interpreted and straightfor-

---

to prior judicial decisions in Michigan. *Nummer v Treasury Dep't*, 448 Mich 534, 544; 533 NW2d 250 (1995); *Pierson v Manning*, 2 Mich 445, 454 (1852).

[25] See, e.g., *Stokes*, 466 Mich at 672 (extinguishing a construction lien placed on a home by an unlicensed residential builder); *Bilt-More Homes*, 373 Mich at 699 (barring an unlicensed residential builder from seeking compensation); *Alexander*, 364 Mich at 487 (same); *Barbour v Handlos Real Estate & Bldg Corp*, 152 Mich App 174, 181-182; 393 NW2d 581 (1986) (refusing to discharge a mortgage given to an unlicensed residential builder in exchange for his services in building a house); *Robert H Pastor Bldg & Real Estate Dev Co v Cole*, 127 Mich App 168, 175; 339 NW2d 11 (1983) (builder not required to be licensed, but joint venture in which it was to participate required license); *Brummel v Whelpley*, 46 Mich App 93, 96; 207 NW2d 399 (1973) (unlicensed residential builder's claim for compensation dismissed).

[26] See, e.g., *Stokes*, 466 Mich at 671-672 (unlicensed residential builder not entitled to quantum meruit relief because "[c]ourts must be careful not to usurp the Legislative role under the guise of equity"); *Grosslight v Butts*, 3 Mich App 51, 55; 141 NW2d 657 (1966), quoting *Turner v Schmidt Brewing Co*, 278 Mich 464, 469; 270 NW 750 (1936) (unlicensed residential builder "cannot maintain an action to recover for such services or materials").

wardly applied MCL 339.2412(1).[27] Given the lack of clarity in the common law, some courts apparently wanted to avoid the issue altogether. So despite numerous indications in dicta that courts believed these contracts to be void *ab initio*,[28] there appears to be no Michigan case that has actually held that a transfer of property or rights *did not occur at all* because the transfer was predicated on a void contract for the provision of construction services by an unlicensed residential builder.

However, there *are* cases that have allowed a party to enforce a contract that contemplated the provision of services by an unlicensed residential builder,[29] suggesting that such contracts are not genuinely void *ab initio* because, if they were, obviously no party could seek recovery for breach of contract. The contract would never have come into existence in the first place and there would have been no basis for a contractual remedy. *Raub v Smith*, 61 Mich 543, 547; 28 NW 676 (1886) ("[I]t has been held that a contract which is void under the statute of frauds cannot be used for any

[27] See, e.g., *Edgewood Dev, Inc v Landskroener*, 262 Mich App 162; 684 NW2d 387 (2004); *Annex Constr, Inc v Fenech*, 191 Mich App 219; 477 NW2d 103 (1991); *Parker v McQuade Plumbing & Heating, Inc*, 124 Mich App 469; 335 NW2d 7 (1983); *Bernard F Hoste, Inc v Kortz*, 117 Mich App 448; 324 NW2d 46 (1982).

[28] See, e.g., *Brummel*, 46 Mich App at 96 ("The contract in the present case is *void* and unenforceable. The parties are in their same respective positions as before they entered into the void contract.").

[29] See, e.g., *H A Smith*, 258 Mich App at 437; 670 NW2d 729 (2003) (unlicensed residential builder defendant could not use equity to defend against the homeowner's claim because the homeowner sought damages for breach of contract, and not equitable relief); *Parker*, 124 Mich App at 471 (unlicensed residential builder may defend a breach of contract lawsuit on its merits); *Lindhout v Ingersoll*, 58 Mich App 446, 450-451; 228 NW2d 415 (1975) (affirming award of damages for breach of contract to homeowner).

purpose. Such a contract is regarded as a nullity.")
(citations omitted). It appears that when the *home-owner* has been the party seeking to enforce the contract, as opposed to the *unlicensed builder*, courts have been willing, at least to some extent, to recognize the validity of the contract.

Michigan's application of the "substantial compliance" doctrine in regard to contracts involving an unlicensed builder further suggests that these contracts are not altogether void. Under this doctrine, if an unlicensed builder enters into a contract to provide building services but *subsequently* obtains the requisite license before he provides services for which the license is required, the contract has been deemed valid and enforceable by the builder.[30] Courts applying the doctrine reason that because the builder has been licensed at the time that he begins performance, he has "substantially complied" with the licensing requirement, even though he improperly entered into a contract while unlicensed. Most pertinently, the doctrine could not be invoked if the contract at issue was genuinely void; if it was truly a nullity at the time it was signed, the builder's subsequent licensure could not logically revive or resuscitate a legal obligation that did not exist in the first place. Thus, courts

---

[30] See, e.g., *Mich Roofing & Sheet Metal v Dufty Rd Props*, 90 Mich App 732, 735-738; 282 NW2d 809 (1979), vacated on other grounds, 409 Mich 887; 295 NW2d 230 (1980); accord *Edgewood Dev*, 262 Mich App at 166-167 (unlicensed builder could recover under contract because the builder became licensed before construction began); *Bernard F Hoste, Inc*, 117 Mich App at 452-453 (unlicensed builder could not recover under contract because it performed services before it obtained license). We need not, and therefore will not, address the merits of applying the "substantial compliance" doctrine to contracts involving an unlicensed builder. Instead, we simply note that courts applying this doctrine to contracts involving an unlicensed builder have not treated these contracts as void.

applying this doctrine have not treated contracts with an unlicensed builder as truly void.

In conclusion, we hold that contracts involving an innocent homeowner and an unlicensed residential builder are voidable.[31] This conclusion is based on relevant inferences derived from MCL 339.2412(1), which suggest that such contracts are better characterized as voidable rather than void. The caselaw of this state further supports this conclusion. Our courts have for decades indicated that a homeowner may be able to enforce contracts with an unlicensed builder, and that such contracts are not necessarily a nullity from the outset. There has been no instance in which an innocent homeowner was denied the right to enforce a contract against an unlicensed builder because the court deemed the contract *void ab initio*. So although there has been considerable confusion regarding the proper legal status of these contracts, we believe that treating these contracts as voidable is the only outcome that faithfully applies MCL 339.2412(1) while giving due consideration to our judicial precedents.[32]

---

[31] Our holding is limited to the type of contract at issue in this case: a contract with an unlicensed residential builder for home construction or repair. The extent to which this holding should be extended to "illegal contracts" of allegedly similar types must be decided in future cases. Compare, e.g., MCL 339.1019, which prohibits an unlicensed personnel agency from maintaining an action for the collection of compensation.

[32] We recognize that contracts between an innocent homeowner and an unlicensed residential builder are not "voidable" in the fullest and most traditional sense of that term. A voidable contract may typically be ratified by the party with the power of avoidance, rendering the contract fully enforceable by either party. *Harry & Max Dunitz, Inc v Meineke*, 260 Mich 586, 588-589; 245 NW 524 (1932); *Roszczewski v Jozwiak*, 225 Mich 670, 672-673; 196 NW 359 (1923). However, in the instant circumstance, an innocent homeowner exercising the power of ratification cannot give an unlicensed contractor the ability to do what the law expressly prohibits—"bring[ing] or maintain[ing] an action in a court of

### D. DEFAULT

Finally, we must determine whether the trial court erred by refusing to set aside Denaglen's default. A default is a punitive measure used to encourage participation and cooperation in litigation. *Rogers v J B Hunt Transp, Inc*, 466 Mich 645, 653; 649 NW2d 23 (2002). Entry of a default judgment is equivalent to an admission of every well-pleaded matter in the complaint. *Lesisko v Stafford*, 293 Mich 479, 481; 292 NW 376 (1940). "Once the default of a party has been entered, that party may not proceed with the action until the default has been set aside by the court . . . ." MCR 2.603(A)(3). A default or a default judgment may be set aside pursuant to MCR 2.603(D), which states:

> A motion to set aside a default or a default judgment, except when grounded on a lack of jurisdiction over the defendant, shall be granted only if good cause is shown and an affidavit of facts showing a meritorious defense is filed.

However, "the policy of this state is generally against setting aside defaults and default judgments that have been properly entered." *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 229; 600 NW2d 638 (1999). "The carelessness or neglect of either the litigant or his attorney is not normally grounds for granting a belated application to set aside a default regularly entered." *White v Sadler*, 350 Mich 511, 522; 87 NW2d 192 (1957). At the same time, a default is merely an admission of liability and not an admission regarding the proper amount of damages. *Haller v Walczak*, 347 Mich 292, 300; 79 NW2d 622 (1956) ("In ordinary actions founded on contract or tort the rule seems well

---

this state for the collection of compensation" for the performance of residential building services. MCL 339.2412(1).

established that a default in appearing or pleading admits the right to recover, but not the amount of the damages."). If the amount of damages is in dispute, a defaulting defendant is nonetheless entitled to a hearing, at which it may challenge the plaintiff's alleged damages amount, if the trial court determines that a hearing is necessary. *Zaiter v Riverfront Complex, Ltd*, 463 Mich 544, 554; 620 NW2d 646 (2001); MCR 2.603(B)(3)(b).

We hold that the trial court did not abuse its discretion by refusing to set aside Denaglen's default. Even after receiving notice of its default, Denaglen inexplicably waited seven weeks before moving to have the default set aside. In arguing Denaglen's motion to set aside the default, and in their applications for leave to appeal, the parties presented irreconcilable accounts of the circumstances surrounding the default. It was for the trial court to evaluate the credibility and reasonableness of the parties' arguments, and it determined that Denaglen had not made the necessary showing to merit relief from the default. The Court of Appeals did not disturb that ruling by finding any abuse of discretion on the part of the trial court and neither do we. *Lawrence M Clarke*, 489 Mich at 272. However, because this opinion calls into question the legal justifications for the lower courts' decisions in favor of plaintiffs' conversion claims against defendants, the potential for an inconsistent or anomalous result exists. If Willis is not liable for converting the insurance checks, then logically Denaglen could not have converted the checks, either. In the face of such an outcome, Denaglen's default, as to the conversion claim only, would need to be set aside. See *Ackron Contracting Co v Oakland Co*, 108 Mich App 767, 774; 310 NW2d 874 (1981) (" '[W]here a bill makes a joint charge against several defendants, and one of

them makes default, . . . if the suit should be decided against the complainant on the merits, the bill will be dismissed as to all the defendants alike—the defaulter as well as the others.' "), quoting *Frow v De La Vega*, 82 US (15 Wall) 552, 554; 21 L Ed 60 (1872).

IV. APPLICATION

The contract between Willis (the unlicensed builder) and plaintiff homeowners was voidable. Because the contract was not a nullity from the outset, it could in theory have conveyed to Willis the authority to receive, indorse, and cash the insurance checks. The trial court, however, granted plaintiffs summary disposition without deciding whether the contract, if valid, would have conferred that authority on Willis. We therefore remand to that court for a determination of whether the agreement granted Willis and his companies the specific authority to perform those actions on plaintiffs' behalf and whether they acted within the scope of that authority.[33]

If on remand the trial court determines that Willis and his companies might be liable for any of plaintiffs' claims arising under the contract, those defendants must be permitted to defend against those claims.

---

[33] We decline to address at this time the extent of damages to which plaintiffs may be entitled should they establish defendants' liability for conversion. We stress, however, that while "the measure of liability [for conversion of a negotiable instrument] is presumed to be the amount payable on the instrument, . . . recovery may not exceed the amount of the plaintiff's interest in the instrument." MCL 440.3420(2). Furthermore, under Michigan's general conversion statute, MCL 600.2919a, a person whose property has been converted "to the other person's own use" "may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees[.]" On remand, we leave it to the parties to assert, and the court to resolve as necessary, whether and to what extent plaintiffs' "interest" in those proceeds, and their "actual damages" for any conversion thereof, should be limited in some amount.

Neither Willis's breach of the contract nor MCL 339.2412(1) prevent Willis from demanding that plaintiffs prove their actual damages. If plaintiffs seek judicial redress, including damages, they are required to prove the extent to which they have been harmed by defendants and defendants are entitled to rebut those proofs.[34] Additionally with regard to any outstanding equitable claims, such as restitution, plaintiffs must also be prepared to establish that they have acted equitably. *Goodenow v Curtis*, 33 Mich 505, 509 (1876). Finally, as discussed earlier in this opinion, the trial court did not abuse its discretion by refusing to set aside Denaglen's default. However, if on remand the trial court determines that Willis and his companies are not liable for converting the insurance checks, that court must set aside Denaglen's default in regard to plaintiffs' conversion claim. This is because Denaglen logically may only be held liable for conversion if Willis actually converted the checks from plaintiffs. It is clear that Denaglen did not convert the checks directly from plaintiffs; therefore, any conversion for which Denaglen may be held liable would have been committed indirectly through Willis. Denaglen thus may not be held liable for conversion if Willis is not. Furthermore, the amount of plaintiffs' damages remains in dispute as already noted. Denaglen is therefore entitled to participate in any hearing that the trial court deems necessary to establish the amount of conversion damages owed to plaintiffs.

---

[34] We note that the extent of the possible harm might include any harm that Auto-Owners suffered by paying any fraudulent or excessive claims. Because Auto-Owners assigned all of its claims to plaintiffs, plaintiffs are entitled to damages compensating any injury sustained by Auto-Owners, as well as any injuries that they might have personally sustained.

V. CONCLUSION

The trial court and Court of Appeals erred by granting summary disposition in favor of plaintiffs. The Court of Appeals correctly held that MCL 339.2412(1) does not prevent an unlicensed builder from defending against a lawsuit on its merits and does not afford a homeowner an independent cause of action to seek damages for its violation. However, contracts between an innocent homeowner and an unlicensed residential builder are voidable by the homeowner and thereby effective in conveying rights and authorities to both parties and third parties. The Court of Appeals therefore erred when it declared the contract at issue void *ab initio*, although that court's error was wholly understandable given the confusing state of applicable law. Finally, the trial court did not abuse its discretion by refusing to grant Denaglen relief from its default. However, because the proper amount of damages remains in dispute, Denaglen may attempt to challenge the extent of its liability. We therefore affirm in part and reverse in part the judgment of the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

YOUNG, C.J., and KELLY, ZAHRA, MCCORMACK, VIVIANO, and BERNSTEIN, JJ., concurred with MARKMAN, J.